WINTER, Circuit Judge:
This appeal is taken from an order, 573 F.Supp. 1245 (D.Conn.1983), entered in three civil actions pending before the district court: In Re Anthony R. Martin-Trigona, Misc.Civ. No. H83-62 (consolidated bankruptcy cases and related matters); Martin-Trigona v. Lavien, Misc.Civ. No. H83-305 (alleging conspiracy and violation of civil rights); and MartinTrigona v. Smith, Civ. No. H83-322 (alleging violation of civil and constitutional rights). The order broadly enjoins appellant, inter alia, from instituting litigation in any state or federal court without fulfilling certain conditions. We affirm in part, vacate in part and remand for further proceedings.
BACKGROUND
To those who follow the business of the courts, the appellant needs no introduction. He is the source of literally hundreds of lawsuits, motions and miscellaneous pleadings, all but a small fraction of which lack any merit whatsoever. Viewing Martin-Trigona’s litigious conduct in its entirety yields the inescapable conclusion that he persistently resorts to legal processes without regard to the merits of the claims asserted and that he invokes those processes largely to harass persons who have unluckily crossed his path. His abuse of legal processes is exemplified not only by the number and variety of meritless actions but also by his recent use of pleadings and other legal papers, the contents of which are set out in their appalling detail in the district court’s opinion, as a vehicle to launch vicious attacks upon persons of Jewish heritage.
The district court is not the first judicial tribunal to take public notice of Martin-Trigona’s determined and persistent misuse of legal processes. A law school graduate, Martin-Trigona was denied admission to the Illinois bar because “he lacks the qualities of responsibility, candor, fairness, self-restraint, objectivity and respect for the judicial system which are necessary adjuncts to the orderly administration of justice,” In re Martin-Trigona, 55 Ill.2d 301, 312, 302 N.E.2d 68, 74 (1973), cert. denied, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). Judge Weinfeld has had occasion to observe
that Martin-Trigona has over the years filed a substantial number of lawsuits of a vexatious, frivolous and scandalous nature. He has been a persistent and calculating litigator. There is a long trail of such actions commenced by him against federal and state judges, bar examiners, public officials, public agencies, lawyers and individuals who in one way or another had any relationship, directly or indirectly, to any matter concerning him.
Martin-Trigona v. Brooks & Holtzman, 551 F.Supp. 1378, 1384 (S.D.N.Y.1982). *1257 Another circuit has commented that Martin-Trigona’s “tendency ... to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him is evident from many of his filings in this record,” Martin-Trigona v. Gouletas, 634 F.2d 354, 362 (7th Cir.), cert. denied, 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980). And this court has noted in a prior proceeding,
[h]is tour through the court system is marked by a persistent refusal to cooperate with court orders and purposeful efforts to delay and jaundice court proceedings. His distinctive brand of pro se advocacy has reached [us] after a barrage of procedural and jurisdictional challenges which have frustrated the courts below and have caused these bankruptcy proceedings to advance at a snail’s pace, with little progress made toward settling creditors’ claims during the past two and one-half years.
Martin-Trigona v. Shiff, 702 F.2d 380, 382 (2d Cir.1983).
THE PROCEEDINGS IN THE DISTRICT COURT
Appellant’s activities in the district court for the District of Connecticut began in 1981 when two bankruptcy cases in which he was involved were transferred from the Southern District of New York. The bankruptcy court consolidated the cases and appointed trustees for Martin-Trigona’s personal estate and for New Haven Radio, Inc., a bankrupt corporation in which Martin-Trigona is sole shareholder. Appellant thereafter refused to be examined and was found in contempt by Bankruptcy Judge Shiff.[1]
In the course of the bankruptcy case, Martin-Trigona authored an array of plenary actions, motions, applications, appeals and other proceedings, including an action naming all the judges in the District of Connecticut as defendants. Martin-Trigo-na’s actions were, following the general practice of the district, randomly assigned among district judges in Connecticut. As his filings multiplied, efficient administration of the inter-related litigation became increasingly difficult. Therefore, at the request of Martin-Trigona, Chief Judge Daly transferred all such pending actions in the district to Judge Cabranes on January 11, 1983.
By order filed May 6, 1983, Judge Ca-branes stayed the bankruptcy proceedings in all respects and scheduled a hearing on all pending motions for June 6. He also required the parties to the bankruptcy proceedings and the United States as a representative of several federal defendants, including judges and the United States Attorney, sued by Martin-Trigona in related actions, to state their views on the course of further proceedings. The United States advised issuance of a broad injunction to prohibit relitigation of decided issues and to establish conditions for the filing of additional court papers. The various named defendants filed motions to dismiss and sought to enjoin Martin-Trigona from suing the trustees in bankruptcy, their attorneys, their families, and persons in privity with them without prior leave of the district court.
The order issued by Judge Cabranes gave appellant notice of the hearing date and the matters to be dealt with, as did the court calendar. In addition, on June 3, 1983, Martin-Trigona appeared before Judge Cabranes in a separate contempt hearing.[2] At that time, the district court *1258 reminded appellant of the June 6 hearing and of the issues to be dealt with at that time. On June 4, Martin-Trigona wrote a letter to Judge Cabranes captioned “Statement Concerning Hearing of June 6, 1983” in which appellant urged the court, inter alia, to cancel the June 6 hearing, which appellant characterized, as “a waste of time.”
Martin-Trigona did not appear at the June 6 hearing. The court heard from various parties and from the attorney representing Martin-Trigona in the criminal contempt proceeding, see note 2 supra, who was present, on various issues. On June 8, 1983 Judge Cabranes entered a temporary restraining order enjoining Martin-Trigona from filing actions in the District of Connecticut until a further hearing was held.
The court also entered an order to show cause why a permanent injunction should not issue and why all actions brought by Martin-Trigona then pending before the court should not be dismissed. The district court scheduled a hearing for June 16,1983 on this order and indicated its intent to consolidate it with a trial on the merits. That hearing was postponed until June 17, 1983. Meanwhile, Martin-Trigona moved to recuse Judge Cabranes and for the appointment of counsel. These motions were denied at the start of the June 17 hearing. In accordance with Fed.R.Civ.P. 65(a)(2), the court consolidated the injunction hearing with a trial on the merits.
Martin-Trigona, appearing pro se, indicated a desire to call as witnesses the bankruptcy trustees and their counsel, the United States Attorney, a special prosecutor appointed in a contempt proceeding and Martin-Trigona’s own court-appointed counsel in that contempt proceeding to prove that “the Jewish defendants” had sustained no injury warranting injunctive relief. The court refused to allow Martin-Tri-gona to put on such evidence. Martin-Tri-gona then asserted his desire to take the stand to testify as to the allegations in his complaints, his intent and his good faith. The court accepted this offer of proof, but when Martin-Trigona was given the opportunity to testify, he declined, stating, “There’s no need for it.”
On June 23, 1983 Judge Cabranes issued a broad permanent injunction, In Re Martin-Trigona, 573 F.Supp. 1245, 1261-68 (D.Conn.1983), which, in-summary, enjoined Martin-Trigona from:
(1) making further filings in any pending case brought by him or on his behalf within the District of Connecticut without first obtaining leave of the court by way of a specific procedure set forth in the injunction.[3]
(2) filing any action in any state or federal court in the United States arising out of (a) the acts of any person or entity involved with the bankruptcy proceedings of Martin-Trigona or of any property in which Martin-Trigona claims an in *1259 terest, or (b) the litigation of any civil action filed by Martin-Trigona relating to such bankruptcy proceedings.
*1258 First, he must file with the complaint a motion captioned, "Motion Pursuant to Court Order Seeking Leave to File.” Second, as Exhibit 1 to that motion he must attach a copy of this order. Third, and as Exhibit 2 to that motion, he must attach either a declaration prepared pursuant to 28 U.S.C. § 1746 or a sworn affidavit certifying that the claim he wishes to present is a new claim never before raised by him in any court. Fourth, and as Exhibit 3 to that motion, he must identify by listing the full caption of each and every suit previously filed by him or on his behalf in any court against each and every defendant to the suit he wishes to file. Fifth, and as Exhibits) 4 (and continuing as necessary) to that motion he must provide a copy of each such complaint and a certified record of its disposition. Sixth, he must serve a copy of this order on each defendant if and when leave to serve the complaint in the new case is granted. Failure to comply with the terms of this order may be sufficient grounds for a court to deny any motion for leave to file made by Anthony R. Martin-Trigona. Further, the failure by Anthony R. Martin-Trigona to advise a court in which he has filed a lawsuit of this order or to comply with this order may be considered by such court a sufficient defense to sustain a motion to dismiss such a lawsuit.
*1259 (3) filing an appeal from such bankruptcy proceedings without first obtaining leave of the court in which he seeks to file the appeal, pursuant to the procedure set forth in the injunction.
(4) filing “any new action or proceeding in any court (state or federal) without first obtaining leave of that court,” by way of the procedure specified for obtaining leave.
(5) filing any document “in any case to which he is not a party without first seeking leave of the court.”
(6) serving any document or paper “purporting to be served in connection with any legal action unless such an action has in fact been filed in a court (state or federal) ... and unless the document ... or paper is properly filed with the court.” The injunction is subject to the following
limitations:
Nothing in this order shall be construed as having any effect on Anthony R. Martin-Trigona’s ability to defend himself in any criminal action brought against him. Nothing in this order shall be construed as denying Anthony R. Martin-Trigona access to the courts through filing of a petition for a writ of habeas corpus or other extraordinary writ. Nothing in this order shall be construed as denying Anthony R. Martin-Trigona access to the United States Courts of Appeals. Nothing in this order shall be construed as affecting any pending action previously brought by Anthony R. Martin-Trigona and presently pending in any state court or any United States Court of Appeals or any United States District Court for any district other than the District of Connecticut.
Judge Cabranes made extensive findings in support of the injunction, which we briefly summarize. Martin-Trigona is known to have filed over 250 civil actions, appeals, and other matters throughout the United States,[4] which have been pursued with “persistence, viciousness, and general disregard for decency and logic.” He has used legal pleadings to ventilate his contempt and hatred of persons of Jewish heritage and to level accusations which “have often been personal, have often emphasized racial or religious affiliations, and have often involved the members of ... judges’ and counsel’s families.” The purpose, nature and effect of his resort to multiple litigation has been to involve as many persons in as many confounding legal processes as possible. With regard to the two bankruptcy proceedings in the District of Connecticut, In re Martin-Trigona and In Re New Haven Radio, Inc., Martin-Trigona has maintained an incessant stream of frivolous or meritless motions, demands, letters to the court and other documents, as well as vexatious lawsuits against the bankruptcy judges, trustees, attorneys and their families and associates, and against Judge Cabranes himself.[5] The effect has been to prevent the orderly administration of the bankrupt estates and to delay as long as possible his own testimony. Martin-Trigona’s voluminous filings have “inundated” the District of Connecticut and his activities have burdened judicial operations to the point of impairing the administration of justice. Finally, Martin-Trigona has not desisted from his course of vexa *1260 tious litigation but has expressly stated his intent to file yet more actions. The district court’s findings are abundantly supported by the record.
DISCUSSION
Martin-Trigona’s appeal is limited to the following questions: (1) whether he was denied due process; (2) whether there is a lack of Article III jurisdiction because there is no case or controversy; (3) whether the moving parties failed to meet their burden of proof or demonstrate irreparable harm; and (4) whether the breadth of the order violates appellant’s right of access to the courts.
A. The Due Process Issues
Martin-Trigona asserts that the district court failed to give him adequate notice and opportunity to be heard at the preliminary hearing. He also claims that the refusal of the district court to appoint counsel violated his right to a fair hearing.
We find these claims to be without merit. First, Martin-Trigona had full notice of the June 6, 1983 hearing by virtue of the May 6 order, the court calendar and the personal notice afforded him by the district court on June 3. His letter to the court of June 4 demonstrated personal knowledge of the hearing date. Nor is his failure to appear excused by his pro se status. Martin-Trigona is “no stranger to the federal courts,” Martin-Trigona v. Skiff, 702 F.2d at 382, and, to say the least, has demonstrated extensive, not to say excessive, familiarity with judicial processes. The notice of the June 6 hearing he received was more than adequate.
Martin-Trigona also argues that he had inadequate notice that the trial on the merits would be consolidated with the preliminary injunction hearing. At the June 6, 1983 hearing, the district court stated that “presumably the preliminary injunction hearing [scheduled for June 16, 1983] would be consolidated under Rule 65 with the trial on the merits of the injunction action.” When that hearing was held on June 17, 1983, the court ordered the consolidation. Martin-Trigona contends that, because of his absence from the June 6 hearing, he never received adequate notice that the court would consolidate the matters. This argument is specious. Martin-Trigo-na’s failure to attend the June 6 hearing does not relieve him of the legal effects of the court’s action at that hearing. Moreover, no prejudice flowing from the consolidation has been claimed, much less demonstrated.
Appellant’s contention that he was denied the opportunity to call witnesses on his behalf is equally meritless. While the court quite properly rejected Martin-Trigo-na’s offer of proof on one issue as irrelevant, it never declined to hear relevant testimony. Martin-Trigona proffered no such testimony other than his own and then declined the opportunity to testify.
Appellant’s argument that denial of his motion for appointment of counsel deprived him of a fair hearing is similarly without merit. The sixth amendment right to counsel of course extends only to criminal and quasi-criminal proceedings. Hannah v. Larche, 363 U.S. 420, 440 n. 16, 80 S.Ct. 1502, 1513 n. 16, 4 L.Ed.2d 1307 (1960); Ferguson v. Gathright, 485 F.2d 504, 506 (4th Cir.1973), cert. denied, 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974); Madera v. Board of Education, 386 F.2d 778, 780 (2d Cir.1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968). In non-criminal cases federal courts have the authority to appoint counsel, but generally they are not required to do so. 28 U.S.C. § 1915(d); see Caruth v. Pinkney, 683 F.2d 1044, 1048 (7th Cir.1982), cert. denied, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983). The determination of whether appointment of counsel is necessary rests with the discretion of the court. Id.
We cannot say that the district court abused its discretion in denying Martin-Trigona’s motion for appointment of counsel. It is of course true that the hearing in question involved Martin-Trigona’s future freedom to invoke judicial proceedings', a not inconsiderable right. However, he failed to move for the appointment of counsel until near or on the very morning *1261 of the final hearing. Granting the motion would have necessitated a further delay in the context of a history of the persistent-use of motions to delay and confuse proceedings. In light of that history, of Martin-Trigona’s experience in judicial proceedings and of the lack of any showing .of prejudice arising from the lack of counsel, we conclude the district court acted within its discretion.
Similarly, we reject Martin-Trigona’s contention that as a debtor in bankruptcy he had a right to appointed counsel under former Bankruptcy Rule 215(a).[6] The trustee has made no such request as the Rule requires. Moreover, since Martin-Trigona continues to contest the jurisdiction of the bankruptcy and district courts in Connecticut, has refused to cooperate with the trustee, has filed at least six lawsuits against the trustee, his attorneys and his family, has already successfully delayed the bankruptcy proceedings for over three years by his “purposeful efforts,” Martin-Trigona v. Skiff, 702 F.2d at 382, appointment of counsel at this stage can hardly be deemed to be “in the best interest of the estate.”
B. The Availability of Injunctive Relief
Martin-Trigona raises several objections to the grant of injunctive relief in this case, including a purported lack of a case or controversy, the movants’ lack of standing and their failure to demonstrate irrepárable harm.
These objections are misplaced since each assumes that the sole judicial role in this proceeding is as a neutral arbiter of a dispute between private parties. That assumption is incorrect. Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions. If such power did not exist, or if its exercise were somehow dependent upon the actions of another branch of government or upon the entitlement of a private party to injunctive relief, the independence and constitutional role of Article III courts would be endangered.
The findings of the district court exemplify this basic principle. In the bankruptcy cases alone, Martin-Trigona has: (i) prevented the fair and efficient administration of the bankrupt estate; (ii) used legal processes solely to harass parties to federal litigation, their counsel, judicial personnel and their families; (iii) deprived such adverse parties of their right to unimpaired access to the federal courts and to an efficient adjudication of claims asserted under federal law; and (iv) injured all litigants with cases pending in the district court (or who have decided to forgo meritorious claims because of the likely delay) and in this court by diverting considerable judicial resources to his voluminous litigation;
Were litigants free to resort to Martin-Trigona’s tactics with impunity, the results would be potentially to render many federal laws unenforceable in federal courts or enforceable only at great cost, to chill litigants from seeking relief to which they are entitled, to deter counsel from representation in cases involving malicious and litigious parties, to make it more difficult to recruit personnel for all positions in the *1262 judicial branch, and, finally, to bring the entire system of justice to a halt, thus depriving all other litigants of their right to an expeditious adjudication of good faith federal claims.
*1261 No attorney or accountant for the trustee or receiver shall be employed except upon order of the court. The order shall be made only upon application of the trustee or receiver, stating the specific facts showing the necessity for such employment, the name of the attorney or accountant, the reasons for his selection, the professional services he is to render, and to the best of the applicant's knowledge all of the attorney’s or accountant's connections with the bankrupt, the creditors or any other party in interest, and their respective attorneys and accountants. If the attorney or accountant represents or holds no interest adverse to the estate in the matters upon which he is to be engaged, and his employment is in the best interest of the estate, the court may authorize his employment. Notwithstanding the foregoing sentence, the court may authorize the employment of an attorney or accountant who has been employed by the bankrupt when such employment is in the best interest of the estate. The employment of any attorney or accountant shall be only for the purposes specified in the order, but the court may authorize a general retainer of an attorney when necessity therefor is shown.
*1262 We act, therefore, not only as an arbiter of a dispute between private parties but also in defense of the means necessary to carry out our constitutional function. In such circumstances, the power to act against vexatious litigation is clear. As we previously have stated:
[t]he United States Courts are not powerless to protect the public, including litigants ... from the depredations of those ... who abuse the process of the Courts to harass and annoy others with merit-less, frivolous, vexatious or repetitive ... proceedings.
In Re Hartford Textile Corp., 659 F.2d 299, 305 (2d Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982) . Moreover, the traditional standards for injunctive relief, i.e. irreparable injury and inadequate remedy at law, do not apply to the issuance of an injunction against a vexatious litigant. Where the jurisdiction of the federal courts is in need of protection, we need not await the arrival of a litigant able to show a private entitlement to relief. Indeed, in cases such as the instant one, private parties and their counsel (who may have to notify an insurance carrier of actions against them no matter how frivolous) may well decide that the course of wisdom is not to seek injunctive relief, which may only generate new harassing actions, but to hope the malicious litigant finds new quarry. A history of litigation entailing “vexation, harassment and needless expense to [other parties]” and “an unnecessary burden on the courts and their supporting personnel” is enough. Matter of Hartford Textile Corp., 681 F.2d 895, 897 (2d Cir.1982), cert. denied, 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983) .
The district court in the present ease thus had the power and the obligation to protect the public and the efficient administration of justice from Martin-Trigona’s litigious propensities. Injunctive relief was fully appropriate, since other sanctions would not be effective. Assessment of costs and legal fees against this appellant might be fruitless in light of the bankruptcy proceedings and even countereffective in that they would lead to yet further protracted litigation.
C. The Breadth of the Injunction
Martin-Trigona also attacks various aspects of the injunctive order. We address only the more significant issues raised and to the extent that certain provisions of the order are not mentioned in this opinion, we agree with and affirm the district court.
We regard the restrictions placed upon Martin-Trigona’s bringing of new actions in all federal district courts as necessary and proper. The district court is part of the federal judicial system and has an obligation to protect and preserve the sound and orderly administration of justice throughout that system. The order does not prohibit Martin-Trigona from seeking access to other federal district courts; it merely requires that he inform the court in question of pertinent facts concerning the action he seeks to bring, including the existence of the injunction order and of outstanding litigation against the named defendants, and that he obtain leave of that court to file the action. These conditions are hardly unreasonable. We need not wait until a vexatious litigant inundates each federal district court with meritless actions to condition access to that court upon a demonstration of good faith. In light of the record before us, which includes reported decisions involving Martin-Trigona in the courts of appeals of at least five circuits in recent years,[7] such a restriction is necessary, if the order of the district court is to have any effect. See In Re Green, 669 F.2d 779, 787 (D.C.Cir.1981).
However, the protection of federal jurisdiction does not necessarily require extension of each provision of the injunction to actions brought in state courts. It is our independence from other branches of *1263 government which is the source of our power to enjoin Martin-Trigona, but that very independence militates against extension of the terms of the injunction to state courts. Abuse of state judicial processes is not per se a threat to the jurisdiction of Article III courts and does not per se implicate other federal interests. We therefore believe that the district court erred in its blanket extension of the injunction to state courts.
It does not follow, however, that some qualifications relating to the protection of federal interests may not be placed upon Martin-Trigona’s resort to state courts. First, while comity usually requires us to abstain from intrusion into state proceedings, a spirit of cooperative federalism calls upon us to alert state courts to Martin-Tri-gona’s past activities so they may take judicial notice of matters relevant to new litigation brought by him. Upon remand, therefore, the district court should continue the provisions of the injunction requiring Martin-Trigona to append pertinent informational materials to pleadings in state courts.
Second, protection of our jurisdiction requires that we shield federal litigants, their counsel, court personnel, their families and professional associates from Martin-Trigo-na’s vexatious litigation in all courts, state or federal. His established practice of resorting to litigation in various fora as a means of harassing anyone who so much as crosses his path in the federal courts— e.g. litigation against the estate of a trustee’s father, litigation against an attorney whose sole role was to move the admission of counsel pro hac vice, litigation seeking to have himself appointed guardian ad li-tem of the district judge’s children — requires us to afford protection to such individuals so they may be spared further harassment and so resort to the federal courts by others is not chilled. The injunction achieves this to some degree by enjoining the bringing of new actions which arise out of the bankruptcy proceedings. However, since the provision relating to new actions in state courts is to be vacated in part, the protection afforded is too narrow. On remand, the district court should fashion an injunction prohibiting Martin-Trigo-na from bringing new actions in any tribunal without leave from the district court against persons who have encountered him in any capacity in litigation in the District of Connecticut or in this court, including, but not necessarily limited to, court personnel, counsel, and the families and professional associates of such persons.
We further note that the district court’s responsibility to protect federal jurisdiction and those individuals or entities who seek access to federal courts may entail periodic revision of the injunction to keep pace with Martin-Trigona’s imaginative pursuit of new methods of harassment. Nothing we say here limits the power of the district court to prevent harassing and vexatious conduct by Martin-Trigona which is related to litigation, pending or concluded, in the district court or in this court.
We believe the injunction should explicitly exempt complaints by Martin-Trigona or anyone acting in his behalf under 28 U.S.C. § 372(c). This provision relates to complaints of judicial misconduct and, absent a finding that Martin-Trigona has abused such proceedings so as to impair the administration of justice, we believe ■access to this avenue of redress should not be limited at this time. Other litigants are not affected by such a proceeding and, since its purpose is to impose a form of monitoring upon the judiciary itself, we believe that enjoining resort to it can be justified only by a finding of abuse impairing the administration of justice. Moreover, consideration of whether the process established under Section 372(c) is being abused and, if so, what remedies are appropriate may best lay with the judicial council of the circuit.
D. Further Proceedings in this Court
The district court order states “[njothing in this order shall be construed *1264 as denying Anthony R. Martin-Trigona access to the United States Courts of Appeals.” As noted above and as exemplified by Appendix C to this opinion, which catalogs Martin-Trigona’s activities in this court, his resort to baseless litigation has included resort to appellate processes. Because resort to appellate procedures carries with it the same vexatious and harassing consequences as proceedings in trial courts and thereby results in a similar impairment of the administration of justice, see In re Hartford Textile Corp., 681 F.2d 895 (2d Cir.1982), we issue herein an order to show cause before this panel within 30 days of this opinion why Martin-Trigona’s resort to this court should not be subject to injunc-tive provisions similar to those applying to his resort to district courts. In the interim, we issue the following preliminary injunction:
Ordered that Anthony R. Martin-Trigona must file in this court within 20 days of the filing of a notice of appeal from a judgment rendered by a district court within this Circuit a motion for leave to take such appeal. Such motion shall indicate supporting grounds and all proceedings in this court relating to such an appeal shall be stayed until such motion is decided. If such a motion is not filed within 20 days, the appeal shall be dismissed. A copy of this order is to be appended to any such notice of appeal and served upon all parties to the appeal. This order shall not apply to an appeal from a judgment rendered against Anthony R. Martin-Trigona as a defendant or adjudicating him in contempt.
Ordered that Anthony R. Martin-Trigona is hereby enjoined from filing any applications for relief other than an appeal from a judgment rendered by a district court in this court unless such application is accompanied by a motion for leave to file such application which states supporting grounds. All proceedings in this court relating to such application shall be stayed until such motion is decided. The clerk shall accept no papers which do not comply with this order.
Ordered that the foregoing provisions of this order shall apply to any appeal or application for relief to this court by New Haven Radio, Inc., except as such appeal or application is authorized by the trustee in bankruptcy.
Ordered that nothing herein shall apply to petitions for rehearing of the present decision by this panel or by the Court en banc or shall be construed to limit Anthony R. Martin-Trigona’s access to the Supreme Court of the United States on any matter.
We believe this order protects private parties from vexatious appellate procedures without preventing Martin-Trigona from pursuing claims with possible merit.
E. Conclusion
For the reasons set forth above, we affirm the district court’s issuance of injunc-tive relief in part and vacate it in part. The order of the district court shall remain in effect until twenty-one days after the issuance of the mandate or until modified in accordance with this opinion. The preliminary order relating to proceedings in this court shall issue forthwith. The appellant is ordered to show cause on or before thirty days after issuance of this opinion why the preliminary order should not be made permanent.
APPENDIX A
UNITED STATES DISTRICT COURT
District of Connecticut
Anthony R. Martin-Trigona, Plaintiff, vs. Harold Lavien, Robert Krechevsky, Alan Shiff, Alan Nevas, Irving Perlmutter, Daniel Meister, Richard Belford, Richard Coan, Jon Schneider, Thomas Urmy, United States District Court, Defendants.
COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF AND FOR MONEY DAMAGES

COUNT ONE

The Plaintiff Complains of the defendants for his first cause of action pleads:
*1265 I. JURISDICTION, VENUE AND JURY DEMAND
1. This Court has jurisdiction pursuant to 28 USCA §§ 1361, 1343, 1331.
2. Venue is proper in this district because all of the defendants have taken action either personally in this district, or from outside the district with the foreseeable impact of forum consequences in this district.
3. Plaintiff demands a jury trial.
II. SUMMARY OF THE ACTION
4. This is a civil rights law suit against a group of Jews who have acted, combined and conspired to violate the laws of the United States and to (a) deprive plaintiff of due process of law and (b) to steal plaintiffs property through the manipulation of this court and other instrumentalities of the federal government, all in violation of the laws and Constitution of the United States.
III. FACTUAL ALLEGATIONS
5. In 1980, plaintiff was kidnapped on void legal process, and held incommunicado, and was not released from kidnapping until April, 1982.
■ 6. While plaintiff was absent from his property, this property was seized by the defendant Jews.
7. Substantially all of the “bankruptcy judges” who have had connection with plaintiffs property have been Jews.
8. All of the trustees appointed by said judges have been Jews.
9. All of the counsel for said trustees have been Jews.
10. The Jews speak and intrigue among themselves, but refuse to talk with plaintiff, except when they have him in chains Messiah-style.
11. Defendant Lavien has flatly asserted it is permissible for him to meet in secret with Jewish lawyers to determine how to loot plaintiffs property.
12. Substantially the entire bankruptcy court system in the entire United States is manipulated and controlled by Jewish judges and Jewish lawyers.
13. Although Jews constitute about 3% of the national population, they constitute almost 100% of the bankruptcy court judges and lawyers.
14. In almost 100% of the cases filed in Connecticut, Jewish bankruptcy judges appoint Jewish bankruptcy trustees who choose Jewish lawyers to represent them.
15. The court may take judicial notice of the fact — exemplified in this case — that Jews, historically and in daily living, acted through elans and in wolf pack syndrome to exclude all goyim from their circles.
16. Whatever they may say publically, in private Jews hate Christians, and have paranoid delusions about themselves and Christians. Jews think of themselves as a master race, or “chosen people,” and hate Christians for worshiping a man whom Jews assassinated and regard as a poseur.
17. Jews work through a national network. For example, when defendant Coan wanted “help” in New York, he chose to call another Jew. When the defendants have sought help, it is always from within the closed system of bankruptcy Jews or its appurtenances.
18. Non-Jewish lawyers in Connecticut refer to the Jewish cabal, euphemistacally, as “Ali Baba and the Forty Thieves,” ehos-ing a non-Jewish, but Semitic, parallel.
19. The existence of the Jewish bankruptcy clan discourages Christian lawyers from participating in the bankruptcy court process and bringing Christian concepts, values and moral standards to the administration of bankruptcy justice.
20. No sociological evidence exists that Jews have superior intelligence or any other special characteristics, other than the herd instinct, which would make them a master race or natural leaders absent their ability to combine and operate in concert.
21. The plaintiff is an honest man, who has worked hard for his property and, in the style of a Palestinian, is beset by a horde of bankruptcy Jews who are trying *1266 to steal his property, and destroy what they cannot steal.
IV. CLAIM FOR RELIEF
22. The actions of the defendant Bankruptcy Jews affect interstate commerce, both generally and specifically in plaintiffs case, where FCC radio licenses, operating in interstate commerce, have been seized by the defendants or their agents.
23. The conduct of the defendants amounts to a combination and conspiracy in violation of the Antitrust laws, 15 USCA § 1 et seq.
Wherefore, Plaintiff sues and demands judgment for damages sustained by plaintiff in violation of the antitrust laws.

COUNT TWO

The Plaintiff Complains of the defendants and for his second cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, HH 1-23 of Count One and further pleads:
24. The defendants have acted, combined and conspired as part of a theocratic and ethnic-based conspiracy in furtherance of the interests of Jews, to violate plaintiffs constitutional rights to due process and right of access to the courts to a neutral and detached judicial system free of Jewish manipulation, domination, control or excessive influence. Meaningful access has been totally denied.
Wherefore, Plaintiff sues and demands and demands judgment for violation of due process and denial of access to the courts.

COUNT THREE

The Plaintiff Complains of the defendants and for his third cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this count, HH 1-24 of Count Two and further pleads:
25. The Department of Justice has promulgated non-discriminatory standards for appointment of bankruptcy trustees. Subsumed within said standards is the predicate that said trustees will themselves not discriminate, as defendants have by seeking out Jewish “counsel” for the Jewish trustees.
26. The regulations under which defendants are bound to appoint trustees, and said trustees are bound to act, have been trampled by the defendants.
27. The regulation creates a private right of action for its violation, 28 CFR § 58.5, and plaintiff has been damaged, and is being damaged by violations of the regulation.
28. Because the defendants are all Jewish' they do not think that the American laws apply to them. Therefore, for example, defendants have schemed to deny plaintiff his constitutional right to counsel. Defendants have refused to obey rules and regulations which require full monthly disclosure of all financial transactions in which they have engaged. Defendants have only exchanged this secret information with other Jews, or tried to enter into manipulative “settlements” to steal plaintiffs property, all in violation of both the letter and spirit of the Justice Department regulation.
Wherefore, Plaintiff sues and demands judgment for violation of the agency regulation.

COUNT FOUR

The Plaintiff Complains of the defendants and for his fourth cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, HH 1-28 of Count Three and further pleads:
29. Plaintiff’s rights have been violated by the conduct of the defendants, who have acted, combined and conspired to violate 42 USCA § 1985(2)(cl. 1).
Wherefore, Plaintiff sues and demands judgment for damages sustained as a result of defendant’s violations of 42 USCA § 1985(2)(cl. 1).
*1267 COUNT FIVE
The Plaintiff Complains of the defendants and for his fifth cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, UU 1-29 of Count Four and further pleads:
30. The defendants have violated and are violating 42 USCA § 1985(3).
31. This case represents a novel twist on § 1985(3) adjudications. The defendants are organized as a religious group to discriminate against plaintiff.
COUNT SIX
The Plaintiff Complains of the defendants and for his sixth cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, UU 1-30 of Count Five and further pleads:
31. The defendants are violating the spirit of 42 USCA § 2000e-16.
32. It is not exactly clear if § 2000e-16 is directly applicable, but it is applicable through its incorporation of Executive Order 11478.
Wherefore, plaintiff sues and demands judgment for violation of 42 USCA § 2000e-16.
COUNT SEVEN
The Plaintiff Complains of the defendants and for his seventh cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, UU 1-32 of Count Six and further pleads:
33. Defendant Nevas has acted, combined and conspired with other defendants to manipulate and control the Department of Justice, and U.S. Marshal’s office and FBI in support of the unlawful discriminatory acts of the defendants, by inter alia, seeking to have the plaintiff murdered in the Bridgeport Correctional Center in January, 1982.
34. Defendant Nevas has refused to investigate complaints of violations of federal laws lodged by the plaintiff, but purports to “investigate” complaints by the defendants, which are used by the defendants to invoke Jewish loyalty in furtherance of the scheme and conspiracy and combination of Jews to steal plaintiff’s property by any means possible, however desperate or unlawful.
35. Plaintiff therefore asks that the U.S. Attorney’s office be enjoined from being manipulated or controlled by Jews, either directly or indirectly, and that it either investigate all complaints on a non-discriminatory basis, or else be removed from any involvement in any matter related to plaintiff.
COUNT EIGHT
The Plaintiff Complains of the defendants and for his eighth cause of action pleads:
1. Plaintiff realleges as similarly numbered paragraphs of this Count, UU 1-35 of Count seven and further pleads:
36. The bankruptcy court in the District of Connecticut is a direct agent of the District Court, operating under emergency rule.
37. Therefore, the active district judges of the District bear direct responsibility for all actions of bankruptcy judges and trustees operating in this district, or who are seeking to act in conjunction wither their like ilk in other districts (Lavien, etc.).
38. The plaintiff has never invoked the bankruptcy jurisdiction of this Court, could not do so because he does not live here, and has steadfastly demanded the dismissal of all bankruptcy litigation in this district for almost two years!
39. This court has ignored these requests for dismissal for two years and bears a large share of the burden for the damage inflicted on an innocent party by the Jewish conspiracy that seized his property and seeks to steal and destroy his life’s work.
*1268 40. This Court is asked to vacate and void the emergency appointment of defendant bankruptcy judges, and to appoint a receiver for the bankruptcy court, who will, inter alia, void all trustee appointments and trustee counsel positions, and make public advertisement that all such positions are open to Christian and Jew alike, and that no bias in favor of Jews will exist any longer. Said ads should also reflect that no more than 3% of the appointments made should go to Jews, since that is their share of the national population. There may be a slight increase if the Jewish population in Connecticut is more than 3%.
Wherefore, Plaintiff sues and demands judgment under equitable principles of law seeking the appointment of a receiver for the bankruptcy court.
V. PRAYER FOR RELIEF
Wherefore Plaintiff sues and prays judgment as follows:
1. Injunctive relief barring any Jew from having anything to do with plaintiffs property, and restoring plaintiffs property to him immediately, by dismissal of all Jewish inspired and Jewish maintained bankruptcy litigation.
2. Money damages against the non-immune defendants in the amount of $10 million, trebled under the antitrust count for total damages of $30 million.
3. Appointment of a receiver for the bankruptcy courts, to extirpate Jewish domination and control of the bankruptcy courts and to ensure and insure non-discriminatory treatment both for people appointed by the courts, and for those people who come into the courts seeking justice under the laws of the United States.
4. For such other relief as may be necessary and proper including counsel fees and costs and other declaratory and injunc-tive relief and additional money damages) after proof at trial.
Respectfully submitted,
Anthony R. Martin-Trigona P.O. Box 2002 Rockefeller Center Station New York, NY 10185
April 18, 1983
APPENDIX B
UNITED STATES BANKRUPTCY COURT
District of Connecticut
In Re:
Anthony R. Martin-Trigona,
New Haven Radio, Inc.,

Debtors.

AFFIDAVIT IN SUPPORT OF MOTION TO RECUSE JUDGE AND FOR OTHER RELIEF
The debtors, by and through Anthony R. Martin-Trigona, individual debtor or Chief Executive of the corporate debtor, hereby submit this affidavit in support of their Renewed Motion to recuse judge.
1. The law partner and secret financial partner of the court, Robert Killian, was subpoenaed, but refused to appear in court. A motion seeking his arrest and charging with contempt will shortly be filed. This court must draw an adverse inference from the refusal of the court’s law partner to appear and testify on matters concerning both financial and political conflict of interest.
2. It is obvious that since September, 1980, my property has been subjected to a massive, continuing Holocaust by Jew judges and Jew lawyers. One cannot ram a never-ending stream of Jews down a man’s throat for years, and expect a person to take it. Just as the Jews claim they have a right to “fight” to avoid a Holocaust, so too a Christian has a right to “fight” (in this case through invocation of the judicial power) to protect himself from a Jewish inspired and Jewish engineered Holocaust which has sought to steal my *1269 property and to have me killed by agents of Jewish thieve squads.
3. The Jews have been running roughshod over me for literally years, since 1980, seeking to destroy and steal my property. Although I was not a Jew hater when these cases began, any love for the Jews I may have had has been dissipated by barbaric tortures inflicted on me by the Jews. I can see now that anti-semitism has a real root in the ageless manipulation, chicanery and murder by the Jews.
4. Jews killed the son of God, and seek to deny the fact, and seek to murder and loot and steal from anyone who opposes their efforts at world domination and efforts at overcoming the curse flowing from the assassination of the Son of Yahweh. There is no question that, in biblical times, Jews were the “chosen people,” chosen by Yahweh to fulfill the coming of his son, the Messiah, and that Jews blew it, and killed the son of their God, and are suffering for it. They continue to delude themselves that they are “chosen people,” even though that role ended 2,000 years ago in assassination, and they continue to sin, steal and blaspheme in the same way that brought about the destruction of the kingdom, and the First Holocaust. As part of their greedy, unsavory efforts, Jews have been conducting a war against me and my property for over two, and nearly three years.
5. In the war against me generated by Jew greed, Jew judges have played a leading role. They act supine in favor of Jew lawyers, enter fictitious findings of fact, seize my property and purport to permit its liquidation, jail me illegally, and seek to harass me and prevent me from exercising my constitutional right of access to the courts.
6. Like the man in the movie Network, I have had it "up to here” with lying, cheating, thieving Jews who are harassing me. I intend, and have begun, a counterattack within the law, by seeking to change the law, and seeking to have a constitutional amendment adopted which would restrict the rights of Jews to act as they do. I am a man of peace, not violence, and would never take a step of personal violence against anyone, even a Jew. But I believe the state, under the law, has the right to engage in state-sanctioned violence where appropriate to protect the state from lawless conduct. This is why I propose a constitutional amendment to seize the property of the Jews, under due process and democracy, and to distribute obscene Jew wealth to feed the hungry, house the homeless and clothe the needy.* I do not seek money for myself. I did not initiate this war, but I will complete it. I do not seek to steal the property of the Jews, as they seek to steal mine. They began the matter by seeking to loot my life’s work and hard earned money, and will be called to answer under the law, as amended. Of course, history teaches that laws can be changed, and.what is law today is not necessary law tomorrow. Given one more cyclical, Jewish-inspired recession, or depression, late in this decade, the climate will be more favorable for my proposed amendment to pass. Already there are stirrings in the government that the American people, and government, are fed up with Jew harassment, repeated daily on a national scale, of the same kind I have experienced since 1980.
7. I do not believe I can receive Justice from a pack of Jew thives, judges and lawyers. I have a right under my constitution (i.e. that of the United States) to a “neutral and detached” judge. “Judge” Krechevsky is not neutral or detached. He is part of a Jew conspiracy to steal my property. And I don’t like it. The Jews have spat upon me, lied against me, defrauded the courts of my country, and denounced me falsely. These are known Jew tactics to loot and steal, are used by Jews worldwide, and most often result in the murder and expulsion of Jews when governments change hands (i.e. Iran). I *1270 repeat that despite the violations of my rights, I believe the rights of Jews should only be abridged peacefully, by constitutional amendment, thereby legitimizing, peacefully, the relief I seek in the long run for the hatred and abuse I have suffered since 1980 from the bankruptcy court system.
8. , I realize that many Jews may laugh at these views, expressed openly in a federal court, and made a historical record. I will let history be the judge and God stand as my witness. But, history shows that history has a sense of humor, or a way of playing strange tricks on arrogant operators such as the Jews. Jews never thought they would be kicked out of Europe, but they were by the Germans. They never thought the Shah would fall in Iran, but he did, and the new government removed them. It is a tragedy of our time that peaceful people, such as myself, are slow to anger, and even slower to take action, and action often turns into overreaction.- I have come to “tune out” cries .over the Holocaust, because Holocaust bretheren are trying to steal and destroy my business. Why should I care what happened to the Jews in Germany, when the Jews living and running around in Connecticut and Boston are trying to steal my business and to jail me. I am more concerned with the evil on earth, and can see how normally rational German people would have been driven to excess when they in effect had become strangers in their own country. I am able to understand how the Holocaust took place, and with every passing day feel less and less sorry that it did, when Jew survivors are operating as a wolf pack to steal my property. The historical fact of the Holocaust will pale in years to come, if Jews do not learn the lesson of the Holocaust, and heal themselves; reasonable people can be led to do unreasonable things if they are provoked long and hard enough. In the same way, the tortures I have experienced since 1980 have aroused a great hatred of the closed society of Jews operating in the bankruptcy courts to steal my business. I know, of course, that justice under law is the only way; it is better to lose this case, and seek revenge in a constitutional amendment and legal expropriation, that it would be to violate the law. But, nevertheless, I have begun to turn the wheels to secure such an amendment.
I do not believe that any of my adversaries in this case, particularly the Jew bankruptcy judges, can be neutral and detached. They have provoked me to extreme hatred by their blatant attempts to break the law and to favor their Jew brothers, hungry swine that grunt to be fed from my property. I have had enough.
9. I also am aware of attempts to retali-zate against me through Krechevsky for my opposition to his law partner Killian. Killian has refused to show his face in court and to testify, a fact that permits an adverse inference and a citation for contempt. The totality of the facts is such that the judge in this case should recuse himself, and either order these cases dismissed or sent back to New York forthwith.
I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.
April 21, 1983
Anthony R. Martin-Trigona
APPENDIX C
[[Image here]]
*1271 [[Image here]]
*1272 [[Image here]]
*1273 [[Image here]]
*1274 [[Image here]]

. Appellant filed a petition for a writ of habeas corpus alleging that the bankruptcy court was not empowered to imprison a recalcitrant witness. The district court granted the writ. On appeal, this court held that because Martin-Tri-gona had failed to seek leave under 28 U.S.C. § 1334(b) (1982) to appeal the order holding him in contempt, the district court had erred in granting collateral relief. Martin-Trigona v. Shiff, 702 F.2d 380 (2d Cir.1983).

. Judge Cabranes has kept civil and criminal contempt proceedings against Martin-Trigona separate from the instant case. He has appointed counsel for Martin-Trigona in both contempt proceedings. After our decision described in Note 1, supra, Martin-Trigona again refused to answer questions and was held in civil con *1258 tempt. We have recently affirmed that adjudication. Martin-Trigona v. Belford (In re Martin-Trigona), 732 F.2d 170 (2d Cir.1984).

. The injunction sets forth the procedure by which Martin-Trigona must obtain leave of court:

. Appendix I to the district court’s order is a list of cases brought by Martin-Trigona. It does not include some recent cases, some state court cases, cases in which Martin-Trigona is not the first named plaintiff and all agency proceedings involving Martin-Trigona. Appendix II lists 53 cases pending in the district court or in this court. Neither Appendix even hints at the voluminous motions, letters, appeals and other documents by which Martin-Trigona has swollen the records in some if not all of these cases. Nor do the district court’s Appendices enumerate the complaints and other documents served on parties but never actually filed with, any court. The compilation therefore considerably understates Martin-Trigona’s activities as a litigant.

. Appendix A to this opinion contains a typical complaint filed by appellant. Appendix B is a typical motion paper. Appendix C lists the matters involving Martin-Trigona in this Court since 1980.

. Former Bankruptcy Rule 215(a) reads as follows:

. See, e.g., Martin-Trigona v. Smith, 712 F.2d 1421 (D.C.Cir.1983); Martin-Trigona v. Shiff, *1263 702 F.2d 380 (2d Cir.1983); Martin-Trigona v. Stewart, 691 F.2d 856 (8th Cir.1982); Martin-Trigona v. Gouletas, 634 F.2d 354 (7th Cir.), cert. denied, 449 U.S. 1025, 101 S.Ct. 593, 66 L.Ed.2d 486 (1980); Martin-Trigona v. Morris, 627 F.2d 680 (5th Cir.1980).

A copy of this proposed amendment, as submitted to the Congress, is attached as Exhibit A and made a part of this affidavit. (Ed. Note: The proposed amendment has been omitted from this Appendix.)