John T. O'REILLY, Plaintiff-Appellant,

and

Contemporary Mission, Inc., et al., Plaintiffs,

v.

The NEW YORK TIMES COMPANY, Defendant-Appellee.

No. 439, Docket 82–7530.

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 1982.

Decided Nov. 2, 1982.

Reverend John T. O'Reilly, pro se.

John G. Koeltl, New York City (Debevoise & Plimpton, James C. Goodale, Mitchell A. Karlan, Robert P. Connolly, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, NEWMAN and KEARSE, Circuit Judges.

FRIENDLY, Circuit Judge:

In this action in the District Court for the Southern District of New York, in which federal jurisdiction is predicated on diverse citizenship, 28 U.S.C. § 1332, Contemporary Mission, Inc., a not-for-profit organization of Catholic priests based in Westport, Connecticut, and four of its five member-priests, including appellant Rev. John T. O'Reilly, have sued The New York Times Company for libel. The alleged libel, printed in the Times for November 1, 1980, was an article about the Mission and its priests by Diane Henry. The article said, *inter alia,* that church officials in St. Louis, led by John Cardinal Carberry, had accused the priests of forging documents for their ordinations; that Monsignor Cusack of the Bridgeport, Conn., Diocese had written that the priests were not recognized by the diocese and were unable to function as Catholic priests; that in 1977 the State of Connecticut had gotten a cease and desist order against them for failing to deliver merchandise; that the Postal Service had charged them with fraud in the sale of bath-oil; that Father O'Reilly had married, which would normally mean his excommunication from the Roman Catholic Church, but that he said he had switched to the Eastern Rite of the Catholic Church which allows priests to marry; and that the Mission's public court record "raises questions about whether the priests may have cloaked a profitable business in the guise of a religious, tax-exempt organization." Plaintiffs allege that these and other statements are false or so incomplete as to convey a misleadingly false impression. The initial complaint, filed on November 20, 1980, and the first amended complaint, filed on December 10, 1980, were signed both by Leonard H. Rubin, Esq., for the New York City law firm of Anderson/Rubin, and by appellant's brother, William D. O'Reilly, Esq., who gave a New Hampshire address. There is no indication, however, that Anderson/Rubin have taken any significant part in the action. William O'Reilly conducted the extensive discovery and motion practice which preceded appellant's request to proceed *pro se;* Anderson/Rubin presumably performed occasional ministerial chores in their capacity as local counsel. The supplemental answer to the first amended complaint contains what amounts to a general denial and pleads ten affirmative defenses.

On April 29, 1982, thirteen days after the Times had filed notice that it was proposing to move for summary judgment, Rev. John O'Reilly wrote the district judge to say that

he had discharged William, without cause and with the latter's consent, and that pursuant to 28 U.S.C. § 1654 [1] he would thereafter *plead* and conduct his case *pro se.* On April 30 counsel for the Times filed a letter of protest with the judge arguing, *inter alia,* that, as the magistrate supervising discovery had already indicated on April 27 when William O'Reilly had announced his brother's intention, Rev. O'Reilly would have to move under Rule 3(c) of the General Rules of the Southern District.[2] The judge rejected Rev. O'Reilly's letter with a handwritten endorsement dated April 30, 1982, reading:

> Application denied. See Rule 3, General Rules of this court. So ordered.

On May 27, 1982, Rev. O'Reilly made a formal motion to proceed *pro se.* Counsel for the Times answered with an affidavit placing two documents before the court:

1. This section which now reads:

   > In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

   derives from the first sentence of § 35 of the Judiciary Act of 1789, 1 Stat. 73, 92. This read:

   > In all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein.

   It was carried without substantial change into R.S. § 747. Especially in light of the original wording it is clear that the "as" clause is only a limitation on who may appear as counsel and does not qualify the right of self-representation.

2. This provides:

   > An attorney who has appeared as attorney of record for a party may be relieved or displaced only by order of the Court and may not withdraw from a case without leave of the Court granted by order. Such an order may be granted only upon a showing by affidavit of satisfactory reasons for withdrawal or displacement and the posture of the case, including its position, if any, on the calendar.

3. In my judgment Mr. O'Reilly has been in the position and is in a position to render effective legal service to Father O'Reilly.

   I find that it would be disruptive to the process of the trial to have Father O'Reilly represent himself. If he had originally intended to represent himself, it might have

The first was a notice by attorney William O'Reilly, dated December 18, 1981, changing his address to care of Contemporary Mission, Inc., 285 Saugatuck Avenue, Westport, Conn. The second was an excerpt from a deposition of one of the plaintiffs, Rev. Patrick J. Berkery, taken on January 20, 1982, in which counsel for the defendant took note of Father O'Reilly's presence and asked attorney William O'Reilly in what capacity he appeared. William answered that Father O'Reilly "is assisting me in a paralegal capacity, as he has throughout the course of this civil action." Counsel for the Times objected to his presence as such but the deposition continued.

The district judge heard oral arguments on the application to appear *pro se* on June 23, 1982. The judge denied the motion in an oral opinion set forth in the margin.[3]

been a different story. I am concerned about the stage in the action that this application is made. I am concerned about the impact on a fair trial which Father O'Reilly as a pro se would have.

My understanding of the term "discharge" when applied to the relationship between an attorney and his client means something different than "discharge" in the context of Father O'Reilly's application. A discharged attorney in normal course disappears.

In this situation there would be only one practical effect if I granted Father O'Reilly's application. Father O'Reilly and Mr. O'Reilly would still sit at counsel table together. The additional step that would be added to the process would be that there would be two openings, there would be two summations, there would be two cross examinations of every witness, there would be a summation by Father O'Reilly in Roman collar before a jury.

The absence of any showing that Mr. O'Reilly's representation has been less than adequate is a glaring absence. I find that there would be a distinct prejudice to the defendant in this case to permit Father O'Reilly to represent himself pro se, but I find beyond that that he would not be representing himself pro se, that it is impossible, given the personal relationship between him and his present attorney, which is that of brother to brother, with the necessary professional relationship which would have to continue to exist, it would be impossible for this to be a truly pro se representation.

It would only be pro se in the sense that Father O'Reilly would be able to play two

Father O'Reilly appealed and, over the opposition of counsel for the Times, a panel of this court granted his motion that the appeal be expedited.

### Appealability

■ Appellee would have us analogize the order here at issue to one denying a motion to disqualify counsel, which we have held to be unappealable under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528 (1949), see *Armstrong v. McAlpin,* 625 F.2d 433 (2 Cir.1980) (en banc), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981), a position subsequently upheld by the Supreme Court in *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). Appellant contends that the closer analogy is to an order granting a motion to disqualify counsel which we have long held to be appealable under the *Cohen* doctrine, see *Fleischer v. Phillips,* 2 Cir., 264 F.2d 515, 517, *cert. denied,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959), a position reaffirmed in *McAlpin, supra,* 625 F.2d at 440–41. Although neither analogy is perfect, the latter seems closer. Rev. O'Reilly has not sought to disqualify his brother; he has simply discharged him. What the district court has done in effect is to disqualify Rev. O'Reilly from representing himself; at the instance of the adverse party it has forced upon him counsel whom he does not want. The practical effect of a *denial* of a motion to proceed *pro se* is thus the same as that of a *grant* of a motion to disqualify—namely, the losing party must go forward in the litigation with representation not of his choosing. *Cf. McAlpin, supra,* 625 F.2d at 440.

Analogies aside, direct application of the three-part "collateral order" test, set forth in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) and repeated in *Firestone, supra,* 449 U.S. at 375, 101 S.Ct. at 674, points toward the appealability of the order here at issue. Under this test an order comes within the *Cohen* doctrine if it "conclusively determine[s] the *disputed question,* resolve[s] an important issue completely separate from the merits of the case, and [is] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand, supra,* 437 U.S. at 468–69, 98 S.Ct. at 2457–2458. The only element here in doubt is the third.[4] It is true, of course, that if plaintiffs should prevail to their entire satisfaction, there will be no need to review the order here in question. There can be no assurance, however, that they will in fact prevail; indeed the Times asserts it is entitled to summary judgment. If such summary judgment should be granted or the case should be decided in the Times' favor after a trial, or the case should be decided in Rev. O'Reilly's favor but with what he deems an inadequate award of damages, Rev. O'Reilly might well be required on appeal to show that he would not have lost if he had been permitted to represent himself. Unless it could be established that William had done something clearly against his interests, as would be unlikely, this burden would be "almost insurmountable", *McAlpin, supra,* 625 F.2d at 441, and thus the order denying his motion to proceed *pro se* would be "effectively unreviewable" within the meaning of the *Cohen* doctrine. To be sure, Rev. O'Reilly's burden on appeal from an adverse final judgment would be greatly lightened if there were a presumption of prejudice

roles. One as witness and one as advocate, and I shall not permit that to happen.

In my judgment there is no constitutional right in the particular circumstances of this case for Father O'Reilly to be permitted to go through the motions of purporting to represent himself when in substance the only change would be the gaining of a distinct and very substantial litigation advantage.

**4.** There is nothing to indicate that Judge Broderick's denial of Rev. O'Reilly's application is in any way "tentative, informal, or incomplete", *Cohen, supra,* 337 U.S. at 546, 69 S.Ct. at 1225. The issue raised by the appeal is "important", both in its "public significance" and its "consequences to the parties", see *McAlpin, supra,* 625 F.2d at 452 n. 1 (Newman, J., concurring in part), and the order can be reviewed without exploration of the merits of the underlying libel action.

from an erroneous denial of the statutory right of self-representation. The Times naturally does not concede the existence of any such presumption—it says only that if we defer review until after judgment we will "have the benefit of a full record with which to assess Judge Broderick's order", Brief at 13—and, whatever the situation in criminal cases may be, see *United States v. Plattner,* 330 F.2d 271, 273 (2 Cir.1964) (prejudice presumed from erroneous denial of the constitutional right of self-representation); *United States v. Dougherty,* 473 F.2d 1113, 1127–28 (D.C.Cir.1972) (harmless error doctrine inapplicable to denial of right of self-representation); *Chapman v. United States,* 553 F.2d 886, 891–92 (5 Cir.1977) (same); *cf. Holloway v. Arkansas,* 435 U.S. 475, 487–91, 98 S.Ct. 1173, 1180–1182, 55 L.Ed.2d 426 (1978) (prejudice presumed when court improperly requires joint representation over timely objection), we know of no authority suggesting any such presumption in a civil case. We therefore hold the order here to be appealable.

### The Merits

We start with the proposition that the right to self-representation in civil cases conferred by § 35 of the Judiciary Act of 1789, although not enjoying the constitutional protection subsequently afforded to the right of self-representation in criminal cases, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), is a right of high standing, not simply a practice to be honored or dishonored by a court depending on its assessment of the desiderata of a particular case. As the Court said in *Faretta, supra,* 422 U.S. at 830 n. 39, 95 S.Ct. at

2538 n. 39: "The Founders believed that self-representation was a basic right of a free people." [5] Section 1654 comes to us freighted with history; it calls back visions of days when much litigation, especially on the "law side", was carried on by strong self-reliant citizens who preferred to appeal to the sense of justice of "the country" rather than entrust their causes to lawyers trained in the intricacies of the law. In light of all this and with a citation to *Faretta,* we recognized in *Phillips v. Tobin,* 548 F.2d 408, 411 (2 Cir.1976), the "long established principle that in the federal courts the parties have the right to plead and conduct their own cases ....", although holding the principle inapplicable when a layman sought to represent a corporation of which he was a stockholder in a derivative suit.

The few qualifications which this court has put on the clear language of the self-representation clause of § 1654 are consistent with its high purpose. One such qualification, enunciated in criminal cases, see *United States v. Bentvena,* 319 F.2d 916, 938 (2 Cir.1963); *United States ex rel. Maldonado v. Denno,* 348 F.2d 12, 15 (2 Cir.1965), *cert. denied,* 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966), but equally applicable in civil cases, is that the right to self-representation must be timely asserted. The right is "unqualified" if invoked prior to trial but is "sharply curtailed" if first asserted after the trial has begun. *Denno, supra,* 348 F.2d at 15. An untimely request is committed to the discretion of the trial court, which may consider, among other factors, the reason for the

---

5. The sources of this belief were several—the widespread confidence in the ability of the average individual to manage all his own affairs; the keen distrust of lawyers which took hold early in the colonial period and quickly established itself as an American "institution", see D. Boorstin, The Americans: The Colonial Experience 197 (1958); L. Friedman, A History of American Law 81–83 (1975); the lingering memories of the Star Chamber's practice of compulsory counsel; and the natural law thinking that dominated the Revolutionary period. See *Faretta, supra,* 422 U.S. at 826–30, 95 S.Ct. at 2536–2539. Tom Paine's statement made in defense of the 1776 Pennsylvania Constitution,

quoted by the *Faretta* court at 422 U.S. at 830 n. 39, 95 S.Ct. at 2538 n. 39, doubtless expressed the prevailing view of the relationship between the right of self-representation and the right to counsel. The "right to plead [one's] own cause", Paine said, is a "natural right"; the "right of pleading by proxy, that is, by a council" is a "civil right", an "appendage" to the natural right which supplements rather than supplants it. Section 1654, like its lineal ancestor in the First Judiciary Act, follows Paine's analysis. The right of self-representation is first accorded; representation by counsel is then recognized as an alternative.

request, the quality of the counsel representing the moving party, the party's prior proclivity to substitute counsel, and the potential disruption to the proceedings. See *Sapienza v. Vincent*, 534 F.2d 1007, 1010 (2 Cir.1976). Rev. O'Reilly asserted his right in timely fashion, well before trial. The fact that his request came swiftly on the heels of defendant's notice of motion for summary judgment does not make it untimely under *Denno* or confer discretion on the judge to treat it as such.

■ A second qualification recognized in our cases is that the rights of self-representation and representation by counsel "cannot be both exercised at the same time." *United States v. Mitchell*, 137 F.2d 1006, 1010 (2 Cir.1943), *cert. denied*, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1944). Although a trial judge may in his discretion permit a party to enjoy both halves of the statutory right, see *United States v. Swinton*, 400 F.Supp. 805, 806 (S.D.N.Y.1975) and cases cited therein, Section 1654 does not itself confer any right to "hybrid representation". *United States v. Wolfish*, 525 F.2d 457, 462–63 (2 Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976). *Accord, United States v. Hill*, 526 F.2d 1019 (10 Cir.1975), *cert. denied*, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *United States v. Daniels*, 572 F.2d 535 (5 Cir.1978). Thus, a party seeking to assert his statutory right of self-representation must clearly and unequivocally discharge any lawyer previously retained. See *Wolfish, supra*, 525 F.2d at 462. Rev. O'Reilly has done just that. In his initial letter to Judge Broderick of April 29, 1982, he stated that "I have discharged my attorney, William O'Reilly, [and] . . . shall henceforth plead and conduct my own case on a *pro se* basis." He repeated this in his letters to the court of May 3 and May 7, 1982, as well as in the oral argument on his formal motion.

■ Notwithstanding this, the Times contends here, as it did before Judge Bro-

derick, that what Rev. O'Reilly really seeks, despite his avowals, is "hybrid representation". In support of this contention it cites our decision in *United States v. Private Brands, Inc.*, 250 F.2d 554 (2 Cir.1957), *cert. denied*, 355 U.S. 957, 78 S.Ct. 542, 2 L.Ed.2d 532 (1958). In that case a corporation and Carey, its President and controlling stockholder, had been jointly prosecuted for fraudulently misrepresenting the quality of chloroform sold to Government agencies. On the day trial was to begin, but before a jury was empanelled, Carey sought permission to proceed *pro se* and to have Driscoll, the attorney who had up to that point represented both him and the corporation, continue to represent the latter. The trial court denied Carey's request and we affirmed. In a passage on which appellee seizes, we stated:

> In the case at bar Mr. Carey in effect wished to be represented by the attorney for the corporation, *whose interests were identical with his own,* and also act as his own attorney. The trial judge may well have thought this would cause delay and confusion in the trial. We cannot see any abuse of discretion in the way he handled the matter . . . . (emphasis supplied) [6]

Appellee argues that the present case is on all fours with *Private Brands.* It points out that while Rev. O'Reilly has purportedly "discharged" his brother William, the latter will continue to represent not only the other individual plaintiffs but the corporate plaintiff, Contemporary Mission, Inc. This argument, however, overlooks the fact that the interests of Contemporary Mission and Rev. O'Reilly, unlike those of Private Brands and Carey, are not identical, much less conceded to be so. As Rev. O'Reilly pointed out in argument, both in the district court and here, certain of the alleged libels—that he had forged documents for his ordination, that he had married in defiance of rules of the Roman Catholic Church and had avoided excommunication only by switching to the Eastern Rite—were directed at him, not

---

6. See also 250 F.2d at 556:

Mr. Driscoll, a competent lawyer, selected by Mr. Carey to represent him and his corpora-

tion, whose interests were conceded to be identical.

at the Mission nor even, in some cases, at any of the other priest-plaintiffs.

We do not find any of the other reasons assigned by the judge adequate to justify denying Father O'Reilly's statutory right of self-representation. The first reason was that:

> [I]t would be disruptive to the process of the trial to have Father O'Reilly represent himself. If he had originally intended to represent himself, it might have been a different story.

The first sentence is conclusory [7] and will be considered in connection with the judge's other reasons. The second sentence is irrelevant; indeed it is very nearly an admission that the other reasons lack merit. The next reason was that William O'Reilly, though "discharged", would not "disappear" but instead would continue to represent Contemporary Mission and the other individual plaintiffs. The only "practical effect" of granting Rev. O'Reilly's motion would thus be that:

> . . . . there would be two openings, there would be two summations, there would be two cross examinations of every witness, there would a summation of Father O'Reilly in Roman collar before a jury.

Except for the matter of the Roman collar,[8] this prospect of multiple arguments, exami-

---

**7.** It is far from clear what sort of "disruption" the judge anticipated. Given Rev. O'Reilly's inexperience with the rules of evidence and with courtroom protocol, a certain amount of confusion, delay, even irregularity, would be expected. But this sort of "disruption" accompanies *pro se* representation generally; it is a price the Framers of the Sixth Amendment and the First Judiciary Act thought well worth paying. See *United States v. Dougherty, supra,* 473 F.2d at 1124–25. In any event, Rev. O'Reilly's performance at the oral argument on his motion should have diminished fears of this sort.

If, on the other hand, the judge thought that Rev. O'Reilly was likely to engage in deliberately disruptive or obstreperous conduct, the measure he chose was far too drastic. A potentially unruly, disrespectful, or overly passionate *pro se* may be clearly and firmly forewarned that he will lose his right of self-representation if he obstructs the trial or creates "a scene". Cf. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (disruptive behavior may operate as constructive waiver of right to be present at trial). But the mere possibility of such disruption, especially if it is as unlikely as it appears to be here, is not a sufficient reason for denying the right of self-representation at the start. See *Dougherty, supra,* 473 F.2d at 1126.

**8.** In *La Rocca v. Lane,* 37 N.Y.S.2d 575, 376 N.Y.S.2d 93, 338 N.E.2d 606 (1975), cert. denied, 424 U.S. 968, 96 S.Ct. 1464, 47 L.Ed.2d 734 (1976), the New York Court of Appeals upheld a trial judge's order requiring a lawyer, who was also a Roman Catholic priest, to doff his collar while appearing as criminal defense counsel in a jury trial. The court reasoned that some jurors might interpret the collar as an implied assertion of the defendant's innocence, while other jurors might transfer their religious prejudices from the lawyer-priest to his client. In either event the fairness of the trial would be seriously threatened. The court therefore held that the interest of the defendant and the state in a fair trial outweighed the lawyer-priest's interest in the free exercise of his religion. See also *La Rocca v. Gold,* 662 F.2d 144 (2 Cir. 1981) (holding that La Rocca was barred by collateral estoppel from relitigating the issue in an action under 42 U.S.C. § 1983).

The present case is distinguishable from *La Rocca,* assuming we should decide to apply it in a federal court. Rev. O'Reilly is not a lawyer who happens also to be a priest; he is a priest who happens also to be a *pro se* plaintiff in a civil action. There is little question that were he to appear at trial only as a party and a witness in his own behalf he would not be expected to remove his collar. Cf. *Close-It Enterprises v. Weinberger,* 64 A.D.2d 686, 407 N.Y.S.2d 587 (App.Div., 2d Dept. 1978) (orthodox Jew must be permitted to wear skullcap when appearing as party). We can see no reason why his assumption of the further role of advocate in his own behalf should be conditioned on his doffing his everyday clerical garb.

It is important to recognize that the present case is highly unusual in that one of its central contested issues is whether Rev. O'Reilly is what he holds himself out, by his dress and otherwise, to be—namely, a full-fledged ordained priest in good standing. To require him to remove his collar, therefore, would not merely infringe on his First Amendment rights but also seriously prejudice his cause in the eyes of the jury. Neither voir dire nor jury instructions could overcome the impression that the court thinks him a fraud. In contrast, any prejudice to the Times can be cured by voir dire and jury instructions. It should be enough to explain that Rev. O'Reilly is simply being permitted to wear his everyday dress and that no inference as to his religious standing is to be inferred therefrom. Given these unusual circumstances we need not decide whether a *pro se* priest can or should be required to remove

nations, and the like, is presented in every case where there are several parties on one side and only one on the other and the former do not unite behind the same counsel. Such cases do indeed enhance problems of trial management, many of which are routinely resolved by obtaining the parties' cooperation. Where such cooperation is not forthcoming, the trial judge has ample powers to prevent duplication and minimize unfairness. Thus, in the present case, the judge can require William O'Reilly to initiate direct and cross-examination, can intervene to prevent repetitious examination of witnesses or other abuses in cross-examination, and can allocate the same amount of time for opening and summation to each side, leaving it to the O'Reilly brothers to divide their time as they see fit. The third reason, the "glaring absence" of "any showing that Mr. O'Reilly's representation has been less than adequate", is irrelevant or worse; a party's right to discharge counsel prior to trial and represent himself does not require any showing of inadequacy. The fourth reason, that "there would be a distinct prejudice to the defendant in this case to permit Father O'Reilly to represent himself pro se," is again conclusory and adds nothing to the points more specifically stated. The fifth reason was that the fraternal relationship between Rev. O'Reilly and William O'Reilly would make it "impossible for this to be truly a pro se representation." We see nothing in § 1654 that warrants denial of self-representation simply because a party's brother is representing other parties. Moreover, the likelihood that the brothers will confer and even coordinate trial strategy does not distinguish the case from any other in which multiple parties have different lawyers. The sixth reason, that "[i]t would only be pro se in the sense that Father O'Reilly would be able to play two roles, [o]ne as witness and one as advocate", applies in every case of self-represen-

tation; if this is an evil, it is one which the first Congress was willing to countenance and which none of its successors has seen fit to remedy. The seventh and last reason was that:

> [T]here is no constitutional right in the particular circumstances of this case for Father O'Reilly to be permitted to go through the motions of purporting to represent himself when in substance the only change would be the gaining of a distinct and very substantial litigation advantage.

The right while indeed statutory rather than constitutional is nonetheless entitled to respect, and the litigation advantage of being able to appear both as witness and as counsel is one which, for better or for worse, parties have been granted in the federal courts since 1789. In sum, while the trial, if there be one, would almost certainly be calmer and easier for the judge to manage if Father O'Reilly had not decided to represent himself, such considerations do not justify refusal of the historic statutory right of self-representation.

At argument appellant requested that we assign the case to another judge. We deny this, having full confidence that Judge Broderick will preside over a trial, if there should be one, with complete fairness to both sides. We shall expect Father O'Reilly to give him full cooperation in this task.

Reversed.

his collar when the action to which he is a party in no way implicates his religious standing.