MANSFIELD, Circuit Judge:
 

 Anthony R. Martin-Trigona appeals from a December 13, 1983, order of the District of Connecticut, Jose A. Cabranes,
 
 Judge,
 
 holding him in summary contempt pursuant to Fed.R.Crim.P. 42(a) and imposing on him a five-day prison sentence.
 
 [1]
 
 After this case had been appealed to the Court of Appeals for the Second Circuit and then remanded to the District of Connecticut, Judge Cabranes on August 9,1984, vacated that part of Martin-Trigona’s contempt sentence which remained unserved with the result that he was incarcerated for one afternoon. Martin-Trigona now appeals from the original summary contempt citation as so modified. We affirm.
 

 Judge Cabranes made the adjudication of contempt during the course of a hearing and scheduled examination of Martin-Trigo-na as a debtor in bankruptcy, pursuant to Bankruptcy Rule 2004.
 
 [2]
 
 The examination
 
 *1019
 
 became necessary after Martin-Trigona had repeatedly attempted to frustrate and impede the orderly administration of the bankruptcy estates of himself and of New Haven Radio, Inc., of which he was the sole stockholder. Both had in 1980 filed Chapter XI bankruptcy petitions in the Southern District of New York. In January 1981 the Southern District of New York Bankruptcy Court ordered the transfer of the two proceedings to the District of Connecticut and directed the United States trustee to reappoint a disinterested trustee for New Haven Radio, Inc.
 

 As appears all too frequently to have been Martin-Trigona’s litigation strategy, he seized the occasion to multiply and proliferate the litigation with resulting delay and expense. First he appealed the orders to the Southern District of New York, which upheld them as “a wise exercise of discretion” and “in the best interest of the creditors and the estate.”
 
 In re New Haven Radio Inc.,
 
 23 B.R. 762, 764 (D.C.S.D. N.Y.1982). He also brought an action in the Southern District of New York against an attorney involved in that appeal, claiming that the attorney, who had moved the admission
 
 pro hac vice
 
 of an out-of-state lawyer, was guilty of an “abuse of the judicial process” and had joined a conspiracy to defraud Martin-Trigona of his property and to injure him in his business. The district court granted summary judgment dismissing the claim and issued an injunction against Martin-Trigona’s subjecting the defendant to any further lawsuits or proceedings based on the making of a motion to admit the out-of-state lawyer
 
 pro hac vice. Martin-Trigona v. Brooks & Holtzman,
 
 551 F.Supp. 1378 (S.D.N.Y.1982).
 
 [3]
 

 When Martin-Trigona subsequently refused to participate in the examination of the estates as ordered by the District of Connecticut bankruptcy court pursuant to Bankruptcy Rule of Procedure 205(a) (now
 
 *1020
 
 Bankruptcy Rule 2004(a)), that court on January 15, 1982, found him in civil contempt for refusing to testify.
 
 In re Martin-Trigona,
 
 16 B.R. 792 (Bankr.D.Conn.1982). The District Court for the District of Connecticut granted a “habeas corpus” petition filed by Martin-Trigona on the ground that a bankruptcy judge lacks the power to imprison for civil contempt,
 
 see Martin-Trigona v. Shiff,
 
 19 B.R. 1001 (D.C.D.Conn.1982). However, we vacated that judgment, holding that, since Martin-Trigona had filed the petition without seeking leave to appeal, the district court should have dismissed his petition.
 
 Martin-Trigona v. Shiff,
 
 702 F.2d 380 (2d Cir.1983). Judge Van Graafeiland’s concurrence noted the extent to which Martin-Tri-gona had already succeeded in delaying inquiry into his bankruptcy estates:
 

 “The district court’s failure to compel petitioner to comply with his legal obligations already has resulted in a full year’s delay in the bankruptcy proceedings.
 

 “There has been enough obstruction and delay in this matter.
 
 If the bankruptcy court cannot incarcerate for contempt, the district court can.”
 
 (Emphasis supplied).
 
 Id.
 
 at 389 (Van Graaf-eiland, J., concurring).
 

 In an effort to manage Martin-Trigona’s proliferation of cases, which in January 1983 numbered 53 in the District of Connecticut alone, Chief Judge Daly transferred all pending actions filed by Martin-Tri-gona to Judge Cabranes. In May 1983 the court consolidated all of the Martin-Trigona cases for pretrial purposes, stayed the actions in all respects pending further order of the court, and scheduled a hearing for June 6, 1983, on all pending motions and proceedings.
 

 On June 6, 1983, Martin-Trigona failed to appear pursuant to the court’s order and on June 8 the court issued an order temporarily restraining him from commencing any new actions, with certain specified exceptions, in the District of Connecticut. On motion of defendants in one of the suits brought by Martin-Trigona, who sought nationwide injunctive relief from his vexatious suits, the court on June 17, 1983, entered a permanent injunction sharply limiting his freedom to commence new litigation and to institute appeals from presently pending bankruptcy proceedings in which he claimed an interest.
 
 See In re Martin-Trigona,
 
 573 F.Supp. 1245 (D.Conn.1983). Recognizing that this grant of nationwide injunctive relief was unique, Judge Ca-branes concluded that “it is an appropriate response to what may well be a unique harm.”
 
 Id.
 
 at 1255.
 

 On appeal we noted that Judge Ca-branes’ findings as to the adverse effects of Martin-Trigona’s tactics on the administration of justice were “abundantly supported by the record,”
 
 In re Martin-Trigona,
 
 737 F.2d 1254, 1260 (2d Cir.1984), and held that in taking steps to deal with abuses of the judicial system federal courts act “in defense of the means necessary to carry out [their] constitutional function. In such circumstances, the power to act against vexatious litigation is clear.”
 
 Id.
 
 at 1262. Except for a restriction on Martin-Trigona’s ability to file lawsuits in any state court without prior permission, we affirmed Judge Cabranes’ order, broadening it to encompass relief against his multiplication of appeals. The district court then issued a new Order of Permanent Injunction in accord with our ruling,
 
 see In re Martin-Trigona,
 
 592 F.Supp. 1566 (D.Conn.1984), after receiving several un-contradicted affidavits setting forth “Martin-Trigona’s well-documented practice of abusing his imagined enemies through legal process.”
 
 Id.
 
 at 1569.
 

 In the meantime, Martin-Trigona had initiated what purported to be a new lawsuit against Judge Cabranes and his wife and others in the Supreme Court of the State of New York, and had conveyed to the Connecticut District Court a document styled “Motion to Recuse Judge.” This motion was premised upon the representation of Judge Cabranes and his wife by two law firms in a private matter unrelated to Martin-Trigona. Because a lawyer in one of the firms had some alleged connection with a case involving Martin-Trigona, the latter
 
 *1021
 
 asserted that “ ‘Judge Cabranes’s personal law firm is thus “up to its eyeballs” in proven conduct amoutning [sic] to criminal conduct, bankruptcy fraud, and theft of money from the debtor in possession.
 
 See In re Martin-Trigona,
 
 573 F.Supp. 1237, 1241 (D.Conn.1983). In properly refusing to recuse himself, Judge Cabranes observed that to permit a litigant to obtain disqualification, without reasonable grounds, of successive judges in a case would interfere with the administration of justice and that Martin-Trigona’s allegations afforded no basis for an inference that the judge’s remaining in the case would create even an appearance of impropriety.
 

 Against this background of intransigence, obstruction, and delay, the court scheduled a Bankruptcy Rule 2004 examination on December 13, 1983. Only shortly after Judge Cabranes had begun the proceedings, Martin-Trigona interrupted them to speak with Mr. Bascetta, an attorney who had just withdrawn from the case, about the fact that he had “nothing further to discuss at this time” with Mr. Bascetta. (Tr. 14). Similar unnecessary interruptions continued unabated.
 
 See, e.g.,
 
 Tr. 35, 36, 37, 38, 71-73, 82, 129-33, 135, 140, 141-42. Martin-Trigona repeatedly raised objections to the court’s jurisdiction,
 
 see
 
 Tr. 8, 41, 112, 114, 116-17, 160, despite the fact that his jurisdictional objections had been fully aired and decided adversely to him in Judge Weinfeld’s thorough opinion in
 
 In re New Haven Radio, Inc.,
 
 23 B.R. 762 (D.C.S.D.N.Y.1982).
 

 Judge Cabranes’ efforts to focus attention on the bankruptcy matters were thwarted by Martin-Trigona’s diversions and increasingly abusive remarks. He repeatedly referred to the proceeding as an “inquisition.” (Tr. 36, 131). Many of his remarks were directed at Judge Cabranes himself, including accusing him of dereliction of duty (Tr. 159-60), referring to the court’s statement as “gross” (Tr. 35), telling the judge “I’m trying to have you indicted” (Tr. 71), and maintaining that the subject matter of an application to the grand jury is the “[court’s] own unlawful conduct” (Tr. 82). With folded arms and a belligerent display of insolent facial expressions and “body language” he spoke of those who “like to hear themselves talk” in the following exchange:
 

 “THE COURT: Let me just say, I do not wish to get into an argument, a discussion of your failure to appear on June 6, 1983. The record is clear on this matter. The Court’s actions are clear. They are stated on the record. We need have no repetition of that.
 

 “MR. MARTIN-TRIGONA: Your Honor, the record is not clear, and that’s the whole point I’m trying to make.
 

 I don’t like to hear myself talk, unlike other people that I come in contact with in this court. I’m just here to make a record.
 

 “THE COURT: What do you mean by that?
 

 “MR. MARTIN-TRIGONA: Your Honor, I think it has many meanings.
 

 “THE COURT: You tell me what you mean by that.
 

 “MR. MARTIN-TRIGONA: What?
 

 “THE COURT: By that last comment, which is accompanied by the folded arms and insolent demeanor that you just displayed.
 

 “MR. MARTIN-TRIGONA: Your Honor, may I respectfully object. I’m just standing in front of the Court with my arms folded.
 

 “THE COURT: What did you mean by that last comment?
 

 “MR. MARTIN-TRIGONA: I think Mr. Coan has a tendency to talk and talk.
 

 “THE COURT: Well, I suggest that you not make any disparaging comments about Mr. Coan. And I, for one, interpreted that as a comment about the Court. And in a devious maneuver designed to avoid the inevitable, perhaps, you have chosen to suggest that Mr. Coan was the target of that.
 

 Now, I just suggest to you that you cut it out.
 

 
 *1022
 
 “MR. MARTIN-TRIGONA: Your Honor, the fact that you take innocent remarks as personal affronts—
 

 “THE COURT: Never mind.
 

 “MR. MARTIN-TRIGONA: —is only evidence of your personal embroilment in this case.
 

 “THE COURT: Mr. Martin-Trigona, I do not intend to permit you to create conditions which will permit you to confuse things further.
 

 I am directing and ordering you not to fold your arms and not to make any remarks disparaging to anyone in this courtroom at any time.” (Tr. 152-54).
 

 Faced with contumacious conduct apparently designed to disrupt the proceeding, Judge Cabranes continued to warn Martin-Trigona that the court was determined to pursue the agenda of the scheduled hearing and that he would not tolerate such tactics being used to obstruct the court’s efforts to inquire into and resolve the issues raised by the bankruptcy cases, which had been filed more than three years earlier. Nevertheless, Martin-Trigona persisted in resorting to insults, and disparagement of court and counsel, turning to anti-Semitic remarks of the type that have figured so prominently in proceedings in which he has been involved.
 
 [4]
 
 This exchange followed:
 

 “MR. MARTIN-TRIGONA:
 

 ******
 

 Now here we get into this question about this ethnically-centered bankruptcy ring that operates in this Court and of which your Honor’s law firm is a part. What is happening—
 

 “THE COURT: What is this now?
 

 “MR. MARTIN-TRIGONA: This is part of the Greenfield Krick and Jacobs, Coan, Perlmutter ethnically-centered bankruptcy ring here in the Court where they trade case[s] among themselves and—
 

 “THE COURT: Mr. Martin-Trigona, if by this you mean what the court has already described as your anti-Semitic commentary, I hereby direct you to discontinue that line of comment. I will not hear anything further about any so-called ethnically-based conspiracy.” (Tr. 157-58).
 

 At this point it was readily apparent that, if the proceeding was to be conducted in an orderly fashion rather than reduced to shambles by Martin-Trigona’s conduct, some measure more than warnings and remonstrances by the court would be necessary. Then came the following exchange:
 

 “MR. MARTIN-TRIGONA:
 

 ******
 

 The bankruptcy ring is these bunch of lawyers who get together, they trade deals, and they all play musical chairs with the rights of litigants.
 

 You have Mrs. Perlmutter and Mrs. Belford who are really making deals here among themselves. What is happening is they’re trying to shift money—
 

 “THE COURT: Mrs. Perlmutter?
 

 “MR. MARTIN-TRIGONA: Messrs. M-e-s-s-r-s, not Mrs. Messrs.
 

 They’re trying to shift—
 

 “THE COURT: The record will reflect that to those of us present it certainly sounded as though it was Mrs.
 

 Go ahead.
 

 “MR. MARTIN-TRIGONA: Your Honor, I think the record should reflect that anyone who studied the French language would not have been confused by
 
 *1023
 
 it. But certainly if the Court is not familiar with the way French is spoken in colloquial terms—
 

 “THE COURT: Mr. Martin-Trigona, I hereby find you in contempt of court for that comment and will have no more of it.
 

 I hereby sentence you to incarceration for a period of five days.” (Tr. 161-62).
 

 The adjudication of contempt was made at 1:20 P.M. At 3:15 P.M. on the same afternoon, Judge Cabranes explained the factual basis for his finding of contempt and ordered that, if Martin-Trigona (whose five-day sentence, if served forthwith, would expire on a Saturday) could not be released on Saturday, the sentence should be reduced by one day so that he could be released at 4:30 on Friday, December 16th. Later that afternoon Judge Cabranes reconsidered his earlier denial of Martin-Tri-gona’s application for a stay of execution and granted a stay until 4:30 P.M. on Wednesday, December 14, to permit him to seek a further stay of execution of sentence in the Court of Appeals for the Second Circuit.
 

 On December 14, Judge Cabranes filed a Memorandum of Decision certifying the following five considerations, each of which involved behavior that occurred within the court’s actual presence, as the basis for his finding of contempt.
 

 “First, in defiance of the court’s repeated instructions, Anthony R. Martin-Trigona persistently refused to address the specific questions at issue before the court, but instead attempted repeatedly to raise and reargue issues concerning the jurisdiction of this court and the transfer of these bankruptcy matters and related proceedings to the District of Connecticut, questions which he has had a full and fair opportunity to litigate elsewhere,
 
 see In re New Haven Radio, Inc.,
 
 Debtor, and
 
 In re Anthony R. Martin-Trigona,
 
 Debtor, 23 B.R. 762 (D.C.S.D.N.Y.1982) (Weinfeld, J.);
 
 Martin-Trigona v. Brooks & Holtzman,
 
 551 F.Supp. 1378, 1380 & n. 4 (S.D.N.Y.1982) (Weinfeld, J.), and which have been the subject of repeated unsuccessful motions before this court to transfer or dismiss actions pending in the United States District Court for the District of Connecticut.
 
 See
 
 Tr. 112-114, 116-117;
 
 see also
 
 Certified Official Transcript of Excerpt A of the Hearing of December 13, 1983 (filed Dec. 14, 1983).”
 

 “Second, in an arrogant and insulting tone of voice, looking broadly at the court, Anthony R. Martin-Trigona sarcastically remarked that he ‘[did not] like to hear [him]self talk, unlike other people that I come in contact with in this court,' Tr. 152, which allusion was taken to refer to the court, Tr. 153, notwithstanding Anthony R. Martin-Trigona’s later disavowal of any intention to refer to the court and his insistence that his insulting remarks were directed at adversary counsel.”
 

 “Third, having disrespectfully and abusively referred to adversary counsel Richard Coan and Irving Perlmutter by their last names only,
 
 see, e.g.,
 
 Tr. 157; Certified Official Transcript of Excerpt A of Hearing of December 13, 1983 (filed Dec. 14, 1983), he repeated his offensive and groundless allegation, on which this court has commented elsewhere,
 
 see
 
 Order of Permanent Injunction (entered June 23, 1983) and Memorandum of Decision (entered Sept. 26, 1983), [573] F.Supp. [1245] (D.Conn.1983), that they participate in a conspiratorial ‘bankruptcy ring’, a conspiracy asserted by Anthony R. Martin-Trigona to be based upon ethnic background or religious belief. Tr. 157-158, 161. [Footnote omitted].”
 

 “Fourth, he stated that ‘[the court’s] law firm’ (actually a firm of which a lawyer retained by the undersigned in a personal matter unrelated to these proceedings is a member) is a part of ‘this ethnically-centered bankruptcy ring that operates in this court,’ ‘where they trade cases among themselves,’ ‘trade deals,’ ‘play musical chairs with the rights of litigants,’ and ‘shift money,’ thus broadly implying that the court is a principal in a conspiracy to steal his property. Tr. 157-158, 161;
 
 see also
 
 Order of Perma
 
 *1024
 
 nent Injunction (entered June 23, 1983) at 6-9
 
 [In re Martin-Trigona,
 
 573 F.Supp. 1245, 1262-63 (D.Conn.1983) (Appendix C)]; Appendix C, Ruling on Motion to Recuse (entered July 1, 1983) at 2-3, 6
 
 [In re Martin-Trigona,
 
 573 F.Supp. 1237 (D.Conn.1983)] [Footnote omitted].”
 

 “Fifth, and finally, in response to a question from the court as to whether he had said that
 
 Mrs.
 
 Coan and
 
 Mrs.
 
 Perlmutter were dealing improperly with debtors’ property in the bankruptcy court,
 
 see
 
 Tr. 161, during what can only be described as a continuation of his intemperate and scurrilous diatribe about the so-called ‘bankruptcy ring’, Anthony R. Martin-Trigona replied that he meant
 
 Messrs.
 
 Coan and Perlmutter,
 
 id.,
 
 and then in a snide, scornful, gratuitous, and insulting manner remarked ‘Your Honor, I think the record should reflect that anyone who studied the French language would not have been confused by it. But certainly if the Court is not familiar with the way French is spoken in colloquial terms — ’. Tr. 162.”
 

 On December 14,1983, we granted appellant’s motion for stay of execution until the argument of this appeal and on December 30, 1983, remanded the case to the district court in accordance with a motion filed by the government at the suggestion of Judge Cabranes. On August 9, 1984, Judge Ca-branes vacated that part of Martin-Trigo-na’s contempt sentence which remained un-served. Thus, although a sentence of five days had initially been imposed, Martin-Tri-gona spent only the afternoon of December 13, 1983 in custody.
 

 Discussion
 

 The threshold question is whether Martin-Trigona’s appeal has been mooted by his service of his entire sentence. We hold that it has not. “[A] criminal case is moot only if it shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.”
 
 Sibron v. New York,
 
 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968). As the
 
 Sibron
 
 court noted, since most criminal convictions involve some adverse collateral consequences, their existence may be presumed.
 
 Id.
 
 at 55, (citing
 
 Pollard v. United States,
 
 352 U.S. 354, 88 S.Ct. at 1898 (1957)). Given Martin-Trigona’s extensive self-generated litigation history and the manner in which questions regarding his character appear in proceedings in which he is involved, we cannot say that a determination of the appropriateness of the contempt conviction will be without collateral consequences.
 

 Federal courts have the power summarily to punish as contempt “misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice.”
 
 Ex Parte Terry,
 
 128 U.S. 289, 304, 9 S.Ct. 77, 79, 32 L.Ed. 405 (1888).
 
 See also Taylor v. Hayes,
 
 418 U.S. 488, 497, 94 S.Ct. 2697, 2702, 41 L.Ed.2d 897 (1974);
 
 Cooke v. United States,
 
 267 U.S. 517, 535, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925).
 
 [5]
 
 This power arises from “the need for immediate penal vindication of the dignity of the court,”
 
 Cooke, supra
 
 at 536, 45 S.Ct. at 395, and is limited to circumstances “where the misbehavior is in the presence of the judge and is known to him, and where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court.”
 
 Johnson v. Mississippi,
 
 403 U.S. 212, 214, 91 S.Ct. 1778, 1779, 29 L.Ed.2d 423 (1971) (per curiam);
 
 [6]
 
 
 *1025
 

 see also Offutt v. United States,
 
 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).
 

 In the present case all of these conditions existed and, indeed, made it clear that summary action by the court was necessary to prevent Martin-Trigona from reducing the hearing and Rule 2004 examination to a shambles. The district court’s efforts to dispose of motions in the pending bankruptcy proceedings and to proceed with the examination of the debtor had already been delayed for the better part of three years by Martin-Trigona’s taking of frivolous appeals and his institution of collateral litigation. Faced finally with the necessity of going forward, he now resorted to repeated interruptions and diversions involving irrelevant matters in an effort to confound and confuse the court and to stall the proceedings. When this failed because of Judge Cabranes’ patient handling of the hearing with a view to achieving its goal, Martin-Trigona resorted to provocative insults in the presence of Judge Cabranes, including repeated characterization of the proceeding as an “inquisition,” disparagement of the judge as a person guilty of dereliction of duty who should be “indicted,” and anti-Semitic references to opposing counsel, accompanied by raising of his voice and an insolent, belligerent display. His insulting references to opposing counsel as “Mrs. Perlmutter” and “Mrs. Bel-ford” followed by a feeble excuse that he meant “Messrs” (a designation that would have made no sense if that term preceded
 
 each
 
 of the two surnames rather than both) and then followed by a statement implying that the court was not sufficiently familiar with the French language to understand him, represented a climax in his efforts at obstruction. Judge Cabranes properly concluded'that imposing a summary contempt sentence was necessary.
 

 “to restore order and to maintain the dignity and authority of the court [citations omitted], and to prevent Anthony R. Martin-Trigona from engaging in the kind of screaming and abusive diatribe against the court in which he recently engaged in a related proceeding....” Memorandum of Decision Certifying Contempt, at 7.
 

 We are not here confronted with a case in which the trial judge has apparently not found any need for immediate action in order to preserve the court’s authority and accordingly has deferred the sentence for contempt until after the trial.
 
 See, e.g., Mayberry v. Pennsylvania,
 
 400 U.S. 455, 464, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971) (sentence of from 11 to 22 years for criminal contempt imposed
 
 after
 
 trial);
 
 Taylor v. Hayes,
 
 418 U.S. 488, 499, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974) (sentence of 4.5 years (amended by trial judge to six months) for criminal contempt imposed
 
 after
 
 completion of trial). In such a case the desirable procedure is to cite the individual for contempt and refer the contempt charge to another judge for hearing after giving appropriate notice and an opportunity to be heard, particularly if the trial judge has become personally embroiled with the contemnor.
 
 Id.;
 
 Fed.R.Crim.P. 42(b);
 
 see also Mayberry, supra,
 
 400 U.S. at 464, 91 S.Ct. at 504;
 
 Offutt, supra,
 
 348 U.S. at 14, 75 S.Ct. at 13;
 
 United States v. Wendy,
 
 575 F.2d 1025 (2d Cir.1978). In the present case immediate action was essential to preserve the court’s authority and Judge Cabranes did not become personally embroiled with Martin-Trigona. On the contrary, having already conducted a thorough exploration of the issue of his personal involvement on an earlier Martin-Trigona motion for his recusal,
 
 see
 
 573 F.Supp. 1237 (D.Conn.1983), he maintained a cool and objective attitude throughout despite egregious misconduct on Martin-Trigona’s part.
 
 [7]
 
 It is significant that even in cases emphasizing certain procedural require
 
 *1026
 
 ments when a contempt proceeding has been deferred, the Supreme Court has recognized that a summary holding of contempt may be necessary in the case of “ ‘an actual obstruction of justice.’ ”
 
 Codispoti v. Pennsylvania,
 
 418 U.S. 506, 513, 94 S.Ct. 2687, 2692, 41 L.Ed.2d 912 (1974) (quoting
 
 In re McConnell,
 
 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962));
 
 see also Taylor, supra,
 
 418 U.S. at 497, 94 S.Ct. at 2702;
 
 Mayberry, supra,
 
 400 U.S. at 463, 91 S.Ct. at 504. This is such a case.
 

 Although Judge Cabranes might in his discretion have given Martin-Trigona “an opportunity to speak in his own behalf in the nature of a right of allocution,”
 
 Groppi v. Leslie,
 
 404 U.S. 496, 504, 92 S.Ct. 582, 587, 30 L.Ed.2d 632 (1972);
 
 Brown v. United States,
 
 359 U.S. 41, 52, 79 S.Ct. 539, 547, 3 L.Ed.2d 609 (1959), there was no need to do so in the present case. Judge Cabranes had personally observed the contumacious conduct and was intimately familiar with Martin-Trigona’s litigation history. Moreover, though Martin-Trigona asked for a stay pending appeal of his sentence, he did not ask for an opportunity to explain his actions.
 

 The result we reach here is consistent with our own earlier decisions. Martin-Tri-gona’s insulting remarks, scornful tone of voice, and disrespect had become “ ‘a flagrant defiance of the person and presence of the judge before the public.' ”
 
 United States v. Marra,
 
 482 F.2d 1196, 1201 (2d Cir.1973) (quoting
 
 Cooke v. United States,
 
 267 U.S. 517, 536, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925));
 
 see also United States v. Pace,
 
 371 F.2d 810, 810-11 (2d Cir.1967) (summary contempt procedure available when immediate punishment is necessary to put an end to acts disrupting proceedings, such as threats to judge, disturbances in courtroom, or insolence before the court). Although, as we noted in
 
 O’Reilly v. New York Times Co.,
 
 692 F.2d 863, 869 n. 7 (2d Cir.1982), a certain amount of “disruption” frequently accompanies
 
 pro se
 
 representation, the disruption that occurred in the December 13, 1983, hearing far exceeded justifiable bounds, particularly taking into account that Martin-Trigona “is not your typical pro se advocate” but a law school graduate.
 
 Martin-Trigona v. Shiff,
 
 702 F.2d 380, 382 n. 1 (2d Cir.1983). Finally, our recent decision in
 
 United States v. Lumumba,
 
 741 F.2d 12 (2d Cir.1984), is inapplicable since the adjudication of contempt in that case was deferred
 
 until the end of the trial, id.
 
 at 13, whereas here the adjudication occurred promptly to deal with a contempt committed at the outset of an evidentiary hearing which it was designed to frustrate.
 

 Lastly, Martin-Trigona challenges the procedure followed by Judge Cabranes in adjudicating him to be in contempt. At 3:40 P.M. on December 13, 1983, in open court, and again at 3:24 A.M. the next morning in a written decision, Judge Ca-branes explained his decision finding Martin-Trigona in contempt and imposing on him a five-day sentence. Martin-Trigona contends that this procedure constituted improper
 
 post hoc
 
 reliance on incidents not immediately before the court, and that the court improperly deprived him of an opportunity to be heard prior to expanding the basis for its contempt finding. We disagree.
 

 Far from constituting an improper
 
 post hoc
 
 justification of the contempt finding, the late night filing of the Memorandum of Decision Certifying Contempt and Order resulted from an agreement among counsel designed to permit an expedited application to this Court for a stay of the contempt order.
 
 See
 
 Tr. 184-88. The Memorandum was completed in accordance with Fed.R. Crim.P. 42(a) (“The order of contempt shall recite the facts and shall be signed by the judge and entered of record."). The purpose of such a decision is not to give the contemnor notice of the charges but to permit appellate review.
 
 United States v. Marshall,
 
 451 F.2d 372, 377 (9th Cir.1971).
 

 For the foregoing reasons the order of the district court holding Martin-Trigona in contempt pursuant to Fed.R.Crim.P. 42(a) is affirmed.
 

 [1]
 

 . Fed.R.Crim.P. 42(a) provides:
 

 "Rule 42. Criminal Contempt
 

 (a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."
 

 [2]
 

 . Bankruptcy Rule 2004 provides in pertinent part:
 

 “(a) Examination on motion
 

 "On motion of any party in interest, the court may order the examination of any person.
 

 “(b) Scope of examination
 

 “The examination of any person under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor’s estate, or to the debtor’s right to a discharge. In an individual’s debt adjustment case under chapter 13 or a reorganization case under chapter 11 of the Code, other than for the reorganization of a railroad, the examination
 
 *1019
 
 may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan.
 

 “(c) Compelling attendance and production of documentary evidence
 

 "The attendance of any person for examination and the production of documentary evidence may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial.”
 

 [3]
 

 . The pattern of Martin-Trigona’s conduct in this case is remarkably similar to that which he engaged in earlier in a bankruptcy proceeding in the District of Massachusetts involving radio station WHET, of which he also was the sole stockholder. In approving the sale of WHET, Bankruptcy Judge Lavien noted that "Anthony Martin-Trigona has not only offered no constructive assistance in the previous administration of this estate but has, instead, attempted to thwart the efforts of the Trustee at every stage.”
 
 In re WHET, Inc.,
 
 12 B.R. 743, 747 n. 2 (Bankr.D.Mass.1981).
 

 In denying a motion by Martin-Trigona that Judge Lavien recuse himself, the latter stated:
 

 "In a real sense, Mr. Martin-Trigona is engaged in bribery by intimidation....
 

 "It may be that Mr. Martin-Trigona, recognizing his legal and factual problem, is attempting by his wild accusations of venal conduct on the part of all the lawyers, trustees, and bankruptcy judges involved in the administration of the estates in both Massachusetts and Connecticut, in the words of former Justice Jackson, to pound loudly on the table in the hope that if he becomes enough of a problem, that by either intimidation or weariness, he may accomplish some part of his purpose. Since he is already in bankruptcy, what does he have to lose? The result is that the accusations increase, the motions, pleadings, complaints and suits multiply, courts and lawyers are buried in mountains of time-consuming paper. If there is one truth, it is that the estate will be bled white by the costs and legal fees engendered by his ‘crusade.’”
 
 In re WHET, Inc.,
 
 33 B.R. 424, 434 (Bankr.D.Mass.1983).
 

 Shortly after the denial of this motion, Martin-Trigona filed a lawsuit against Judge Lavien (among others); the complaint is rife with viciously anti-Semitic assertions such as that "Defendant Lavien has flatly asserted it is permissible for him to meet in secret with Jewish lawyers to determine how to loot plaintiffs property.” Complaint quoted in
 
 In re Martin-Trigona,
 
 737 F.2d 1254, 1264 (2d Cir.1984) (Appendix A).
 

 Martin-Trigona subsequently sought leave to file a claim against a bankruptcy estate arising out of the alleged fraudulent sale of WHET.
 
 See In re Acton Foodservices Corp.,
 
 39 B.R. 70 (Bankr.D.Mass.1984) (denying leave to file claim).
 

 [4]
 

 . In his action filed in the Southern District of New York against a bankruptcy judge,
 
 Martin-Trigona
 
 v.
 
 Lavien,
 
 Civ. No. 83-2944 (S.D.N.Y.), Martin-Trigona referred to the judge as a "crooked, slimy Jew, who has a history of lying and thieving common to members of his race.” In his complaint in
 
 Martin-Trigona v. Lavien,
 
 Civ. No. H-83-305 (D.Conn.), he stated, among other comments:
 

 "Jews, historically and in daily living, act through clans and in wolf pack syndrome....
 

 “Non-Jewish lawyers in Connecticut refer to the Jewish cabal, euphemistacally [sic], as ‘Ali Baba and the Forty Thieves’-
 

 “No sociological evidence exists that Jews have superior intelligence or any other special characteristics, other than the herd in-stinct_”
 
 In re Martin-Trigona,
 
 573 F.Supp. 1245, 1263 (D.Conn.1983) (Appendix C.).
 

 [5]
 

 . The Advisory Committee on Federal Criminal Rules’ Note to Fed.R.Crim.P. 42(a), quoted
 
 supra
 
 at note 1, states “This rule is substantially a restatement of existing law,
 
 Ex parte Terry,
 
 128 U.S. 289 [9 S.Ct. 77, 32 L.Ed. 405];
 
 Cooke v. United States,
 
 267 U.S. 517 [45 S.Ct. 390, 69 L.Ed. 767].”
 

 [6]
 

 . Title 18 U.S.C. § 401 (1982) contains a similar limitation on use of the summary contempt power, it states in relevant part:
 

 "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
 

 "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice_”
 

 [7]
 

 . On an earlier occasion, counsel for Martin-Tri-gona had commented that in his dealing with Martin-Trigona Judge Cabranes had displayed the patience of Job. (Proceedings before Judge Cabranes on October 25, 1983.) At oral argument on another Martin-Trigona appeal heard the same day as this appeal, the same counsel referred to the "many things that Mr. Martin-Trigona has done specifically to Judge Cabranes which have never been the subject of contempt citations and which don't appear on any court records.”